872 F.2d 1023
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
AGRIBASICS FERTILIZER COMPANY, INC., Plaintiff-Appellee,
Cross-Appellant,
v.
SLT WAREHOUSE COMPANY, Defendant-Appellant, Cross-Appellee.
 Nos. 88-5024, 88-5026.
 United States Court of Appeals, Sixth Circuit.
 March 29, 1989.
 
 Before: DAVID A. NELSON and ALAN E. NORRIS, Circuit Judges, and PIERCE LIVELY, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 In this appeal, defendant, SLT Warehouse Company ("SLT"), appeals from an order of the magistrate finding it liable for losses suffered by plaintiff, Agribasics Fertilizer Company ("Agribasics"), under an inventory certification agreement. Agribasics cross-appeals the magistrate's computation of damages.
 
 
 2
 Agribasics is a manufacturer of fertilizer raw materials and a wholesale distributor of finished commercial fertilizers. In 1984, Agribasics began selling raw materials to and purchasing finished products from Seco, Inc., a manufacturer of granular fertilizers in Streator, Illinois. Agribasics stored large quantities of both raw materials and finished products at Seco's warehouse facility. Due to the volume and value of this inventory, Agribasics contracted with SLT to perform inventory certification services.
 
 
 3
 Pursuant to the inventory certification agreement, SLT hired from among Seco's employees five "security guards," who were to keep track of Agribasics' inventory on a daily basis. Additions to Agribasics' stock of either raw materials or finished products were evidenced by "inventory certificates" stating the approximate quantity and value of the additions, and withdrawals were similarly documented by "withdrawal certificates." The product was not weighed when it was certified into inventory; instead, the volume of the amount of fertilizer would be estimated and multiplied by a figure for standard weight per cubic foot. Therefore, the following legend appeared on each inventory certificate:
 
 
 4
 Merchandise listed herein is fungible, and issuance of Inventory Document is notification to Holder hereof that such merchandise is to be mingled with goods of the same kind, grade, and quality. The above merchandise is subject to a 10% tolerance. SLT is not responsible for loss, damage, detioration [sic] from, or dehydration of moisture content of grain or other bulk inventory. (Emphasis added.)
 
 
 5
 This legend did not appear on the withdrawal certificates, as it is conceded that inventory was weighed as it was removed.
 
 
 6
 Because of the inherent imprecision of this method of certification, SLT was also given the right to make periodic adjustments to Agribasics' book inventory if routine physical inventories by an SLT auditor determined that a significant variance existed between book inventory and actual inventory. If inventory were to be adjusted upward, an inventory certificate would issue and Seco would invoice Agribasics for the increase. If inventory had to be adjusted downward, a withdrawal certificate would issue and Agribasics would invoice Seco for the decrease. Seven such inventory adjustments were made by SLT as a result of audits during its performance under the contract.
 
 
 7
 As time passed, Seco apparently began experiencing economic difficulties. The SLT "security guards" then started responding to pressure from Seco to exaggerate inventories in order to enhance billing by Seco to Agribasics and other users of the Seco warehouse. Seco declared bankruptcy on July 30, 1985, and ceased doing business. As Agribasics began to remove its product from Seco's warehouse, it became apparent that SLT's certified book inventory was much higher than the actual physical inventory on hand. After the closing of the facility, Agribasics sent SLT a demand for payment of $275,349.63 for shortfalls of inventory.
 
 
 8
 The case was tried by consent to a United States Magistrate, who determined that Agribasics suffered a loss as a result of its reliance upon SLT's inventory certificates. The magistrate specifically found that SLT acted improperly by allowing Seco to engage in the following conduct: (1) physical inventories were changed for the purpose of exaggerating inventory on hand; (2) changes to production reports were made to generate cash flow for Seco; (3) an upward adjustment of 500 tons was made to the potash inventory although SLT's head agent acknowledged that the product was not there; (4) labels on bins of fertilizer were changed in anticipation of periodic audits; and (5) a sham inventory adjustment was made the day before Seco ceased operations in a last-ditch effort to protect it and SLT. The magistrate computed the loss on a lot-by-lot basis and applied the ten percent tolerance factor to the deficiencies after Agribasics removed its fertilizer, awarding it $300,425.85. Subsequently, however, the magistrate changed his mind and, in an order granting SLT's motion to alter or amend the judgment, concluded that the ten percent tolerance factor should be applied to the amount certified into Agribasics' inventory, rather than to the deficiency in inventory. Under this new system of computation, the net loss to Agribasics was determined to be only $22,888.51. Final judgment was entered by the district court on December 1, 1987, and this appeal followed.
 
 
 9
 Initially, we decline to accept SLT's invitation to overturn as clearly erroneous the magistrate's factual finding that Agribasics proved that it incurred a loss in reliance upon SLT's inventory certificates. As the magistrate stated, "there can be no doubt that plaintiff relied on SLT's Inventory Certificates in continuing to do business with Seco. Had SLT done its job properly, plaintiff would have been in a position to attempt to protect itself from what was ultimately thrust on it by Seco's insolvency and closing." The magistrate's conclusion that Agribasics suffered a detrimental loss is not clearly erroneous.
 
 
 10
 Having affirmed the magistrate's finding that Agribasics suffered a loss as a result of its reliance upon SLT's inventory certificates, we turn now to the proper measure of damages. The resolution of this issue largely depends upon interpretation and application of the ten percent tolerance factor. The basic dispute between the parties with respect to damages concerns the point at which the tolerance factor should be applied. Agribasics contends that the ten percent tolerance factor should be applied to the book inventory as of the date the final product was removed from inventory at Streator; thus, under this view, SLT would be liable for ninety percent of any amount of inventory left on the books when all product had been withdrawn. SLT argues that the tolerance factor should apply at the date the product was originally delivered into inventory. This interpretation would result in SLT being liable only for any eventual shortfall in product greater than ten percent of the amount certified into inventory.
 
 
 11
 The magistrate initially was inclined to agree with Agribasics' view. In his original memorandum opinion, the magistrate determined that Agribasics' application of the tolerance factor and calculations of loss were correct, basing his conclusion upon another provision of the certification agreement stating that the extent of SLT's liability would be limited to "any deficiency of inventory then outstanding on Inventory Certificates." The magistrate read the "then outstanding" language to require that liability be determined at the time that the amount of a shortage or loss is detected and ascertained, with the tolerance factor then being applied as part of the liability determination. The opinion made reference to an exhibit in which Agribasics had calculated its loss on a lot-by-lot basis, considering only those lots where there was an ending deficiency and disregarding lots where there was a surplus. These were the bases upon which the magistrate concluded that SLT was liable for losses amounting to $300,425.80.
 
 
 12
 This award was reconsidered, however, upon a motion to alter or amend the judgment filed by SLT. Stating that the approach previously adopted "had the effect of holding defendant liable for ninety percent of the shortage in each lot where there was a shortage of product and not giving defendant credit for lots where there was an overage of product," the magistrate decided that such a result should not stand. The magistrate then revisited the contract and concluded that the ten percent tolerance factor should be taken into account for all of the lots. This led him to determine that the tolerance factor should apply at the date the product was originally delivered into inventory.
 
 
 13
 In the magistrate's opinion, the parties "basically agreed that products certified into Agribasics' inventory would be there subject to a plus or minus ten percent tolerance factor. If, for example, [SLT] certified 1,000 tons of product into inventory, the band of tolerance would be 900 tons to 1,100 tons." The magistrate explained that "the band of tolerance was set at plus or minus ten percent due to the difficulty of estimating the size and volume of the piles of fertilizer. Therefore, sometimes plaintiff would get more than it paid for and sometimes less. By the law of averages, the result should balance out in a fair manner." Therefore, it was concluded that the parties never intended for SLT to be a guarantor for ninety percent of any shortage, in the face of the unavoidable inaccuracies in measurement. Adopting SLT's interpretation of the tolerance factor, and looking at all the lots, the magistrate thus determined that SLT would be liable for any shortfall in product greater than ten percent of the amount certified into inventory, but that this amount would be off-set by any amount (rather than any amount in excess of ten percent) of "extra" product or overage in other lots. The loss was redetermined to be $52,134.69 in shortfalls, less $29,246.18 in overages, or $22,888.51.
 
 
 14
 We are in agreement with the magistrate that the tolerance factor should be applied at the date the product was originally delivered into inventory. The language of the legend containing the tolerance factor supports this construction, as the "10% tolerance" applied to the "above quantity" recorded on the inventory certificate. In addition, the legend appeared only on the inventory certificates, and not the withdrawal certificates. That the stamp was used solely when the product was introduced into inventory is very persuasive evidence that the parties intended that it was the amounts certified into inventory that were properly subject to a tolerance. Further, it is clear from the record that an allowance was granted SLT because the weight of the product certified into inventory was arrived at through measuring volume. In view of the imprecision of measurement at the time of certification, the logic of applying the tolerance factor to the amounts certified into inventory is irresistible.
 
 
 15
 We also agree with the magistrate's finding that proper application of the tolerance factor should take into account all the lots, including lots where there was an overage. However, the magistrate erred in jumping to the immediate conclusion that, as a result, SLT should be given full credit for all the overages--even those which did not exceed ten percent. In both opinions, the magistrate made a factual finding that the parties intended that the tolerance factor would provide a plus or minus ten percent cushion for SLT. In explaining this band, the magistrate noted that it was assumed by the parties that shortfalls between 0-10 percent would, over a period of time, likely balance out with overages between 0-10 percent, and therefore the tolerance factor operated in a manner that was fair to both parties. The logical extension of this observation is that the tolerance factor should be applied when both shortfalls and overages are considered; that, while losses are to be computed based upon shortfalls in excess of ten percent, so should credit be given for an overage only to the extent that it exceeds ten percent. If overages between 0-10 percent were intended to be balanced against shortfalls between 0-10 percent, then those overages should not result in credits. Because none of the overages in this case were greater than ten percent, SLT is not entitled to receive any offsetting credits, and is therefore liable for all the losses represented by shortfalls in excess of ten percent, valued at $52,134.69.
 
 
 16
 Agribasics also contends that the magistrate erred in reversing on reconsideration its award of $33,750 for a shortage in the lot of potash on the ground that, although a loss had been proven, Agribasics failed to establish the amount of the loss. While Agribasics removed slightly more potash from storage than was certified into inventory, 500 tons of potash was determined to belong to Cominco, Inc. Agribasics reached a settlement with Cominco and thereafter maintained that it was entitled to recover for the amount of the settlement. The magistrate denied this request on the ground that "[t]he amount that [Agribasics] paid Cominco to settle the dispute is not of record." However, this finding is incorrect, as the record includes deposition testimony of the president of Cominco that Agribasics paid Cominco $25,000 to settle the dispute. Nonetheless, Agribasics has not proven a loss in reliance on the inventory certificates, as the amount actually withdrawn from inventory is well within the band of tolerance. Therefore, Agribasics' claim for the amount paid to settle the dispute over potash must be denied.
 
 
 17
 For the foregoing reasons, the judgment of the district court is affirmed in part and modified in part, and this cause is remanded to the district court with instructions to enter judgment in favor of Agribasics in the amount of $52,134.69.
 
 
 
 *
 The Honorable Pierce Lively became Senior Circuit Judge on January 1, 1989